**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KENNETH A. MAXWELL,** | : | **Case No.: 05cv2135** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **CUYAHOGA METROPOLITAN** | : | <u>**OPINION AND ORDER**</u> |
| **HOUSING AUTHORITY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

Before the Court is *Defendant's Motion for Summary Judgment* (Doc. 52), filed by the Defendant, Cuyahoga Metropolitan Housing Authority ("CMHA").  The Plaintiff, Kenneth A. Maxwell ("Maxwell") has filed a brief in opposition (Doc. 54), CMHA has filed a brief in reply (Doc. 58), and Maxwell has filed a surresponse (Doc. 59).   Accordingly, this matter is ripe for adjudication.  For the reasons articulated below, the Defendant's motion for summary judgment is **<u>GRANTED</u>** with respect to Maxwell's age discrimination claims and **<u>DENIED</u>** with respect to his retaliation claim.

I.      <u>**BACKGROUND**</u>

This is an employment action that arises out of Maxwell's separation from his former employer, CMHA.  Maxwell alleges that CMHA wrongfully terminated him on February 4, 2005 during a reduction in force.  He alleges that he was terminated due to his age, despite qualifications equal to or in excess of those possessed by other employees who were retained and/or rehired. Maxwell, who is in his 50's, alleges that he and another worker, in his 60's, were laid off, while three similarly situated workers, one in her 30's, one in his 40's and one in his 50's, were offered transfers

within the company, and the company offered to rehire one similarly situated worker in his 30's.

Following his termination, Maxwell completed CMHA's grievance process without satisfactory result in the Spring of 2005.  Thereafter, Maxwell filed a claim with the Ohio Civil Rights Commission ("OCRC") and later received a right to sue letter from the United States Equal Employment Opportunity Commission ("EEOC") on May 12, 2005.

On August 4, 2005, Maxwell filed two claims in Ohio state court: (1) a claim for violation of his rights under the Federal Age Discrimination in Employment Act, 29 U.S.C. §621-634 ("ADEA"), and (2) a state common law claim for wrongful discharge in violation of public policy. On September 7, 2005 the case was removed to this Court on the basis of federal question jurisdiction.  Maxwell has since filed an Amended Complaint (Doc. 12), adding a claim of "retaliation in violation of Ohio Revised Code § 4112.02(I) as enforced by Ohio Revised Code § 4112.99." The Court permitted the amendment in a non-document order on June 6, 2006, noting that it expressed no opinion regarding the ultimate viability of the new claim.  On July 13, 2006 the Court granted CMHA's motion for partial judgment on the pleadings (Doc. 14), dismissing Maxwell's state law claim for wrongful discharge in violation of public policy.   CMHA now seeks summary judgment with respect to Maxwell's remaining claims for age discrimination and retaliation.

II.    **FACTS**

A.    **Facts Related to Maxwell's Termination**

Maxwell began working at CMHA in 1993, as a project manager in the Procurement Department.  Based on Maxwell's resume, he held the following positions at CMHA:  Technical Advisory Group Coordinator, Assistant Chief in the Prepare For Occupancy Department, and Project Manager in the Procurement Department. Doc. 54-16.  Over the years, Maxwell obtained numerous

2

certifications related to the housing field generally.[1]  Most importantly for purposes of this lawsuit, he became a HUD Real Estate Assessment Center ("REAC") Inspector in 2005.

Maxwell's last position at CMHA, beginning in 2003, was as a coordinator in CMHA's Technical Advisory Group ("TAG").  TAG was a division of the Planning and Analysis Department at CMHA.  Maxwell described his duties as a member of TAG as follows:

> The department . . . was newly developing.  I think the agency was kind of feeling its way along what exactly we would do.  Our basic assignments were to advise the administrative staff on policies, procedures, and practices that could improve the service to . . . our residents and to the agency.  That entailed us doing site inspections.
>
> We were all – or most of us were certified public housing managers . . . .  We did the pre-REAC inspections, we did file maintenance.  If a manager . . . was out sick or on vacation, we'd fill in for them until they got back to work or until the agency hired somebody else.  It was just a hodgepodge of things that they had us do.

Maxwell Dep. 55:16-56:9 (June 16, 2007) ("Maxwell Dep."); *see also* Doc. 54-15 (CMHA TAG Coordinator Position Description); Pollack Dep. 9:9:19-25 (June 11, 2007) ("Pollack Dep.").

On February 4, 2005, CMHA eliminated TAG as part of the reduction in force ("RIF") that resulted in Maxwell's termination.[2]  In addition to the six TAG employees, approximately 25 other CMHA employees were terminated.  *See* Doc. 52-6 (listing CMHA employees terminated in connection with the February 4, 2005 RIF).  CMHA's stated reason for the RIF was the need to cut payroll costs due to a decrease in HUD funding.  *See* Phillips Dep. 18:23-25.  CMHA warned Maxwell and other CMHA employees that a RIF was likely at a meeting approximately a week prior to Maxwell's termination. Maxwell Dep. 40:7-10.

---

[1]  Maxwell was certified by the U.S. Department of Housing and Urban Development ("HUD") as a 203-K Consultant, a Housing/Facilities Manager, and for income and rent determinations.  He is also a State of Ohio Certified Real Estate Appraiser and certified as a Weatherization Instructor and Energy Auditor.

[2]  Maxwell does not dispute that there was a reduction in force in February, 2005 at CMHA.  *See* Maxwell Dep. 56:17.

3

At the time of Maxwell's termination, TAG consisted of six CMHA employees.  The following list identifies the six TAG employees, their year of birth and age, and their employment status with CMHA *after* the RIF on February 4, 2005.  *See* Docs. 52-9; 54-10.

| Name | Year of Birth | Age in 2005 | Employment Status at CMHA Following the 2/4/05 RIF |
|------|---------------|-------------|---------------------------------------------------|
| Andre Barnes | 1969 | 36 | terminated |
| Brian Journee | 1964 | 41 | transferred to Property Maintenance Specialist position |
| Chris Drenski | 1955 | 50 | transferred to open Housing Manager position |
| Kenneth Maxwell | 1950 | 55 | terminated |
| Robert Williams | 1935 | 70 | terminated |
| Tracy Reese | 1968 | 37 | "Loaned" to another department prior to the RIF (effective 2/1/05), remained there after the RIF |
| Totals: 6 employees | | 4 over age 40; 2 under age 40 | 3 terminated; 3 transferred |

At 36, Andre Barnes was the youngest TAG employee.  His official title was Technical Advisory Group Specialist.  *See* Barnes Aff., Doc. 54-6.  Like Maxwell, he was terminated on February 5, 2005.  Unlike Maxwell, CMHA offered to rehire Barnes when he applied for a "Service Person II" position.  Barnes interviewed for the position in April, 2005 and CMHA offered him the job.  He declined.  CMHA also called Barnes in the Summer of 2006 to offer him a similar position,

4

and he again declined.  *Id*.  Maxwell states that he applied for the same position at CMHA but was never offered the job.  Maxwell asserts that he was qualified for the job – in fact, he says that he was clearly more qualified for the job than Barnes.

Tracy Reese, age 37, was transferred to a Program Analyst position just prior to the RIF.  The parties are not in agreement regarding Reese's status at the time of the RIF.  Maxwell maintains that Reese was filling in as a Program Analyst in the Planning and Analysis group, but was still a member of TAG in February, 2005.  *See* Doc. 54-8.  The CMHA Personnel Transaction Form reflecting Reese's transfer from TAG to Program Analyst in the Planning and Analysis group lists February 1, 2005 as the effective date – several days prior to the February 4 RIF.  *See* Doc. 54-10.  Maxwell explained at his deposition that it was common for TAG members to temporarily substitute in other divisions of CMHA.  *See* Doc. 54-8.  Furthermore, Reese's transfer was not approved by the budget department or the executive director until after the RIF.  In light of the Court's obligation to construe the facts in the light most favorable to the non-moving party in evaluating the merits of a motion for summary judgment, the Court will treat Reese as a member of the TAG group.

Brian Journee, age 41, was transferred to a Maintenance Supervisor position when TAG was eliminated.  CMHA states that Journee was transferred to the Maintenance Supervisor position because he had previous experience at CMHA as Assistant Chief of Maintenance and because he was a journeyman pipefitter.  Maxwell points out that, as a supervisor, Journee could not perform pipefitting under Union rules.  Maxwell also points out that he was at least as qualified, if not more qualified, for the Maintenance Supervisor position.  Maxwell had formerly worked in a position involving supervision of maintenance within CMHA's Prepare for Occupancy department.  He had also worked in housing management since 1993 at CMHA, and since 1980 at other organizations.

5

Chris Drenski, age 50, was transferred to a housing manager position.  Like Maxwell, Drenski had a slightly different title within TAG – they were both "Coordinators" as opposed to "Specialists."  The only significance of the title "coordinator" as opposed to "specialist" appears to be related to salary – those employees with more experience and a higher salary were given the "coordinator" title in order to maintain their salary.  *See* Pollack Dep. 9:1-13.  Prior to joining TAG, Drenski had acted as an Assistant Housing Manager, Housing Manager, and Acting Chief of Housing.  Maxwell points out that it was "common knowledge within the group [TAG] that Ms. Drenski was planning to retire in the near future, and she spoke openly about it, including to [Maxwell]."  Doc. 54-6 (Maxwell Aff.).  In addition, CMHA documents indicate that Drenski was on FMLA leave at the time of the RIF.  *See* Pollack Dep. 34.

Robert Williams, the oldest employee in the TAG group, was terminated in connection with the RIF.

### B.    Relevant Post-Termination Facts

After the RIF, Maxwell did two things to secure employment:  he applied for open positions at CMHA (and elsewhere), and, as noted above, he became a certified HUD REAC inspector.

### 1.    Maxwell's Applications for Rehire at CMHA

The letter CMHA gave employees who were terminated in connection with the RIF encouraged them to apply for future openings at CMHA.  Doc. 54-17.  Maxwell did so, applying for numerous positions at CMHA during the period between February 12 and July 19, 2005.  *See* Doc. 54-4 at 18-19.  Although CMHA interviewed Maxwell for an open property manager position, a purchasing agent position, and a Section 8 inspector position, CMHA did not call him back or hire him.  *See* Doc. 54-8 (Maxwell Aff.).  CMHA produced in discovery only one (incomplete) set of

6

interview evaluation forms in connection with Maxwell's post-RIF interviews for positions at CMHA. These evaluation sheets are almost blank, and include no negative assessments of Maxwell's qualifications or demeanor. Maxwell avers that he was qualified for each of these positions, and that at no time did anyone tell him that he had been terminated or would not be rehired because he was a "problem employee." *Id.* Furthermore, he avers that his job evaluations at CMHA were consistently positive, "exceeds expectations" or better. *Id.* Consequently, Maxwell believes – essentially by process of elimination -- that he was not rehired or transferred because of his age. *Id.*

CMHA points to Maxwell's disciplinary and criminal record as a CMHA employee as a basis for its decision not to transfer. Specifically, at his deposition, Maxwell discussed the following disciplinary actions in his employee file:

(1)     A written reprimand in 2000 for an unknown incident that Maxwell describes as "minor." Maxwell Dep. 42:18-25.

(2)     A written reprimand in 2003 related to an "outburst that [Maxwell] had with a subordinate." As Maxwell describes it, he lost his temper with a subordinate on a hot, hectic day and told him to "get the fuck out of here." *Id*. at 43-45.

(3)     A period of approximately three weeks of paid administrative leave in 2003 related to allegations by a contractor that Maxwell was improperly steering CMHA business to certain contractors. Maxwell explains that he was put on administrative leave while CMHA and law enforcement authorities investigated the charges. The media also became involved when television reporter Carl Monday investigated the allegations. Maxwell disclosed the allegations to CMHA in a letter dated January 24, 2003, and he states that he was exonerated of any wrongdoing by the investigation. After CMHA concluded that he had acted appropriately, Maxwell returned to work. *See id.* at 47-50.

(4)     A five-day suspension for a dispute with his supervisor, with whom he had an ongoing personal conflict. Maxwell contests the legitimacy of this discipline, and says that he was prepared to fight it in court at the time. He testified at his deposition that he chose to let it go when CMHA decided, informally, that although the

7

suspension was designated as unpaid, they would not deduct five days of wages from his paycheck. *See id.* at 50-55.

CMHA also references Maxwell's criminal record. Around 1978, Maxwell was convicted on multiple counts of check fraud and related offenses. Maxwell Dep. 8-9. In addition, Maxwell pleaded guilty to a charge of domestic violence approximately six years ago. *Id.* at 13-15. Although Maxwell has never been convicted of another criminal offense, he was arrested in connection with a murder investigation approximately 30 years ago, and, he was charged with a separate murder approximately two years later. *Id.* at 10. Maxwell testified at his deposition that, in both cases, law enforcement wanted to keep him involved simply because he was a potential witness, and let him go after talking to him. *Id.* at 11-12.

With respect to his criminal record, Maxwell notes that CMHA knew he had been convicted of check fraud when it hired him in 1993, and that CMHA has an "admirable tradition" of giving individuals with a criminal record a chance to work and better themselves.

### 2. Maxwell's Contract with HUD REAC to Inspect CMHA Properties

After the RIF, Maxwell obtained a HUD certification as a REAC inspector. REAC – the Real Estate Assessment Center – is the division of HUD that does physical inspections of HUD properties. A HUD-REAC inspector is qualified to contract with HUD to perform REAC inspections of HUD properties at public housing authorities like CMHA. The results of a REAC inspection can impact the amount of funding the public housing authorities receive from HUD – negative results can lead to a decrease in funding. *See* Pollack Dep. 17:19-23; Phillips Dep. 32:10-16.

According to Maxwell, soon after he was terminated, he told CMHA executive director

George Phillips, in person, that he was going to get REAC certified and bid on CMHA's REAC inspection contracts.  Maxwell Dep. 102-04.[3]  He testified at his deposition that Phillips asked him if he could be fair, but told Maxwell that he would "champion" Maxwell's cause with the board. *Id.* at 103.  Further, Maxwell testified that he had a similar telephone conversation with Phillips after he filed this lawsuit against CMHA, and after he was awarded the REAC contract to inspect CMHA properties, in which Phillips asked him again if he could be fair.  Maxwell assured Phillips that he could and would be fair.  *Id*. at 104.

Maxwell bid on, and was awarded, the CMHA REAC inspection contract in February or March of 2006.  Maxwell Dep. 92 (March); Doc. 54-11 (awarded February 14, 2006).  He did not tell REAC or HUD that he had been a CMHA employee or that he had a lawsuit pending against CMHA.  Maxwell Dep. 92.   He did not believe his prior employment and pending lawsuit created a conflict of interest.  *Id*. at 94-95.

When CMHA found out that Maxwell was bidding on the REAC contracts, members of the CMHA executive staff raised the issue of a conflict of interest with executive director Phillips. Phillips Dep. 11.  Phillips testified that, although he was not personally concerned about a conflict of interest, he acknowledged that the existence of a conflict was a legitimate question and he directed a CMHA staff member to raise the issue with HUD.  *Id*. at 9-10.  At his deposition, Scott Pollack testified that, after raising the issue with Phillips, CMHA and Phillips decided to take a two-pronged approach to the fact that Maxwell would be the REAC inspector.  Pollack Dep. 19.  First, because of the importance of the inspections for funding and compliance, proceed with scheduling the

---

[3]  Maxwell testified that he told Phillips that he was likely to be awarded the REAC contracts for CMHA because the nearest certified inspectors were not located in Cleveland.

9

inspections with Maxwell in order to get them done in a timely fashion.  At the same time, raise the issue of a conflict of interest with HUD.  *Id.*  Pollack stated that the goal of the second prong was to preserve an objection in case the results of the inspections were not good.  *Id.* at 22.

A series of emails and telephone calls between CMHA (particularly Scott Pollack), REAC, HUD, and Maxwell regarding the potential conflict of interest ensued.  Doc. 54-11 (email correspondence); Maxwell Dep. 96-115; Pollack Dep. 15-22.  Although the record is unclear as to the precise chronology or content of the conversations, it is clear that CMHA contacted HUD in late February or early March, 2006 to raise the issue of Maxwell's potential conflict of interest.  Doc. 54-11.  HUD was concerned about the potential issue and notified REAC.  On March 10, 2006, REAC contacted Maxwell by email and told him that a conflict of interest existed and that he should find another inspector to do the CMHA work.[4]  The email quoted the conflict of interest provision of the inspection contract between Maxwell and REAC, and concluded that "[i]f you were an employee [of CMHA] at any time, it is a conflict of interest for you to inspect these properties."  Phillips Dep. Ex. 13.

In response, Maxwell sent the following email (with the subject line "Tell me it an't [sic] so?") to executive director Phillips on March 16, 2006:

> Sir,
>     It is my understanding from HUD, that CMHA has objected to my inspecting the agency.  What's up with that??? [sic]

Phillips Dep. Ex. 12.

---

[4]  The email exchanges between REAC and HUD indicate that REAC did not have a blanket policy prohibiting a company from bidding on properties when the owner of the company is a former employee of the entity controlling the properties.  Doc. 54-11.  The emails indicate that some people at HUD and REAC thought such a policy was warranted.

10

Phillips replied to the above email on March 17, 2006, as follows:

That is not true.  There was no objection at all.  Who did they say objected?  How was the objection done?  I talked with no one other than you on this.  If you can get a name, that will help me on this end.

*Id.* at Ex. 12.

At his deposition, Phillips explained this email exchange as follows:

A.  This was an e-mail from Ken Maxwell to me.

Q.  Does this also set forward your e-mail response?

A.  Yes, it does.

Q.  Is it fair to say Mr. Maxwell brought to your attention in this e-mail that, ostensibly, CMHA was objecting to his REAC inspections?

A.  No, it's not true.  Mr. Maxwell initially called me and stated that I was the one who was making these assertions, and that's what I was referring to.  No, I was not.  I hadn't objected to a thing.  And I wanted to find out who told him what was going on.  And this was my attempt to do just that.

Phillips Dep. 33.

In addition, Maxwell testified that he called Phillips on the telephone on March 17, 2006, and that Phillips denied directing anyone to raise an objection with REAC.  Maxwell Dep. 113.  At his deposition, however, Phillips testified that he directed a member of his staff to contact HUD regarding a potential conflict of interest with Maxwell.  Phillips Dep. 9.

Subsequently on the same day – Mach 17th – Denise Hancsak of HUD sent Phillips the following email:

Mr. Phillips,

I just got a call from Ken Maxwell, who was awarded CMHA's REAC inspections, asking me to contact you.  Mr. Maxwell said you had requested (via email) information as to who raised the objection about his performing CMHA's

11

inspections.

Here's the chronology, for your information (I did not share with Mr. Maxwell). Tom Marshall [of HUD] received a call from Scott Pollack [of CMHA] raising a concern about Ken Maxwell performing the inspections. The concern centered around the fact that Mr. Maxwell was a former CMHA employee that had been let go by the agency. Mr. Marshall was disturbed about the potential conflict of interest and elevated the issue to REAC. From there, REAC coordinated directly with Mr. Maxwell and directed him on how to proceed. This office was not involved in any way with the discussions between Mr. Maxwell and REAC.

Hope this helps answer any questions you may have about how this situation evolved. Please call or email if you need any further information/clarification on discussions that took place.

Denise

Doc. 54-11 at 7-8.[5]

After REAC informed Maxwell that they interpreted his prior employment at CMHA as creating a conflict of interest and that he would have to essentially sub-contract the work, Maxwell contacted his lawyer regarding the conflict of interest issue and, with the advice of counsel, concluded that REAC's interpretation was incorrect. Maxwell Dep. 114-15. Maxwell sent HUD emails expressing his position and requesting a final ruling from HUD. When HUD did not respond, Maxwell informed them that he would go ahead and schedule the inspections with CMHA. *Id*.

In fact, Maxwell scheduled and performed the CMHA inspections in 2006. Compared to the prior year, CMHA's scores were "substantially lower" on the REAC inspection performed by Maxwell, although not low enough to effect CMHA's HUD funding. Phillips Dep. 24:15-23. As a result, CMHA appealed the scores through the standard HUD appeals process. In the appeals process, a few of the negative ratings Maxwell had recorded were reversed, but most were upheld.

---

[5] Tom Marshall is the local director of HUD's public housing program in Cleveland, Ohio. Pollack Dep. 21. Denise Hancsak is also a HUD employee in Cleveland.

In late November, 2006, CMHA – this time via a letter from executive director Phillips – renewed its conflict of interest objection to Maxwell performing the inspections, this time based in part on the fact that Maxwell's inspections had led to lower scores.  In the November 2006 letter, for the first time, CMHA informed HUD that, in addition to being a former CMHA employee, Maxwell also had filed this lawsuit against CMHA on August 4, 2005. Doc. 54-11.[6]

Maxwell believes that CMHA did not disclose the lawsuit at the outset – *i.e.*, in March of 2006 – to conceal its retaliatory intentions.

In response to Phillips' November, 2006 letter, HUD forwarded the concern to REAC on December 1, 2006.  Doc. 54-11.  On December 5, 2006, HUD informed Scott Pollack of CMHA by email that Maxwell had been decertified as a REAC instructor.  *Id*.  In addition to the forwarded message saying that Maxwell was no longer a certified REAC inspector, the message from HUD said "Good news from REAC – finally!"  *Id*.

Maxwell was decertified after Robert Garrett, the Inspector Administrator of REAC nationally, came from Atlanta, Georgia to do a quality assurance review of Maxwell's inspections of non-CMHA properties.  Maxwell Dep. 117-23.  Garrett's review involved anonymously observing Maxwell for two days as he inspected REAC properties and noting any deficiencies or errors in Maxwell's performance.   Garrett's review was negative.  Maxwell states that Garrett admitted that he was wrong with respect to several negative assessments, but, nonetheless, Garrett decertified Maxwell as a result of his observations.  Maxwell also notes that he found it odd that the national *supervisor* of REAC quality assurance inspectors came to observe him instead of sending one of his

---

[6] After performing the 2006 inspections, Maxwell bid on, and was awarded, the CMHA REAC inspections for the following year.  Phillips Dep. 32.

13

subordinates (which Maxwell believes was standard operating procedure).  *Id.* at 119.

In addition, as evidence that CMHA was deeply involved in his decertification, Maxwell points to the fact that Garrett sent George Phillips of CMHA a letter informing Phillips that "[a]n investigation of Mr. Maxwell's inspection activities was conducted to include a thorough review of complaints received."  Doc. 54-13 (Letter from Garrett to Phillips dated December 12, 2006).  The letter referenced Phillips' letter to HUD objecting to Maxwell's inspections based on CMHA's belief that the existence of this lawsuit and the fact that Maxwell was formerly employed by CMHA was a conflict of interest that should preclude Maxwell from inspecting CMHA properties.  Garrett's letter concluded that Maxwell would no longer be inspecting CMHA.  Doc. 54-13.[7]

CMHA argues that only REAC, not CMHA, had the power to decertify Maxwell.  Moreover, CMHA asserts that it never asked REAC to decertify Maxwell or expected that he would be decertified.  CMHA argues that it simply informed HUD of a potential conflict of interest and left the matter in HUD's hands.

## III.   LAW AND ANALYSIS

This case arises on CMHA's motion for summary judgment under Rule 56 of the Federal

---

[7]  The full text of Garrett's letter to Phillips, dated December 12, 2006, is as follows:

This letter is in response to your letter dated November 29, 2006 to Mr. Thomas S. Marshall, Director of the Cleveland Office of Public Housing regarding Inspector Kenneth Maxwell.

An investigation of Mr. Maxwell's inspection activities was conducted to include a thorough review of complaints received.  Following the review, Inspector Administration (IA) analyzed findings and took appropriate action.
Mr. Martin [sic: Maxwell] will not be conducting any REAC Inspections in the near future.

We appreciate you for taking the time to alert us to IA issues.

Sincerely,
[Robert I. Garrett - Inspector Administrator]

14

Rules of Civil Procedure.

### A.    Legal Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the  matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 560 (6th Cir. 2004).  A fact is "material" only if its resolution

15

will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248

(1986). Determination of whether a factual issue is "genuine" requires consideration of the

applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether

reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is

entitled to a verdict."  *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a

showing sufficient to establish the existence of an element essential to that party's case and on

which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the

trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine

issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)

(citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving

party is under an affirmative duty to point out specific facts in the record as it has been

established which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F.

Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to

overcome summary judgment; it is not enough for the non-moving party to show that there is

some metaphysical doubt as to material facts.  *Id*.

### B.    Jurisdiction

Maxwell has submitted claims for age discrimination under the ADEA, 29 U.S.C. § 623

*et seq.*, and retaliation in employment practices under Ohio Revised Code § 4112.02(I).  With

respect to Maxwell's age discrimination claims, this Court clearly has jurisdiction over his claim

that CMHA's did not retain or transfer him on the basis of age discrimination.  That is, the claim

arises under the federal ADEA, and Maxwell satisfied the prerequisites to filing this lawsuit – he

filed a Charge of Discrimination with the EEOC and OCRC on February 15, 2005, received a "right to sue" letter from the EEOC dated May 12, 2005, and timely filed this action after authorized to do so by the EEOC.

In his briefing on summary judgment, however, Maxwell argues that CMHA's decision not to *rehire* him after he was terminated was also motivated by age discrimination. CMHA argues that Maxwell did not properly raise a failure to rehire claim because his Amended Complaint does not include sufficient facts and allegations related to such a claim. CMHA is correct. Nowhere in the Amended Complaint does Maxwell mention that he applied for positions with CMHA after the RIF, or allege that the failure to place him into those positions was discriminatory. Indeed, Maxwell's Amended Complaint is carefully structured and, even under the most liberal of readings, gives rise to only three, clearly defined, causes of action: failure to transfer in violation of the ADEA; wrongful discharge in violation of Ohio public policy; and retaliation in violation of Ohio law relating to his REAC inspections of HUD properties. In the jurisdictional statement, Plaintiff makes clear that jurisdiction over his discrimination claim is predicated on the fact that the claim arises under federal law and grows out of the charge he filed with the EEOC and OCRC. Similarly, Maxwell clarifies that jurisdiction over his retaliation claims is predicated on 28 U.S.C. § 1367, the provision which authorizes the Court to exercise supplemental jurisdiction over state law claims that arise out of the same facts and circumstances as a properly-asserted federal claim.

This chosen structure for Maxwell's Amended Complaint is meaningful, and directly relevant to the scope of the Court's jurisdiction. This is so because, under the ADEA, the plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before

bringing a discrimination lawsuit.  29 U.S.C. § 626(d)(2).  With respect to this requirement, the

Sixth Circuit has stated: "the judicial complaint must be limited to the scope of the EEOC

investigation reasonably expected to grow out of the charge of discrimination."  *Dixon v.*

*Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (quoting *Weigel v. Baptist Hosp. of East Tennessee*,

302 F.3d 367, 380 (6th Cir. 2002).  "[T]he facts alleged in the body of the EEOC charge . . . are

the major determinants of the scope of the charge."  *Id*. (omitting quotations and citations).

Consequently, this Court only has jurisdiction over Maxwell's failure to rehire claim if the facts

alleged in the body of his EEOC charge would have prompted the EEOC to investigate CMHA's

failure to rehire Maxwell.

Maxwell filed his "Charge of Discrimination" with the OCRC and the EEOC on February

15, 2005.  In the body of Maxwell's EEOC Charge, he states that he is 55 years old, that he

worked for CMHA as a TAG Coordinator, and that he was laid off on February 4, 2005 "due to a

cut in funding."  He also states that believes he was discriminated against on the basis of age for

three reasons: (1) because "95 %" of the employees terminated in connection with the RIF were

in the protected class; (2) because CMHA retained the other TAG Coordinator, Brian Journee,

who was under 40 at the time,[8] and (3) because CMHA did not follow its own discharge policies

in executing the RIF.  None of these allegations mentions a failure to rehire.  Maxwell's EEOC

Charge would not have prompted the EEOC to investigate CMHA's hiring practices *after* the

RIF because the facts alleged in the Charge relate only to Maxwell's termination and CMHA's

failure to transfer him to another position at CMHA.  This is particularly true when one considers

the chronology of events.  Maxwell first applied for a new job at CMHA on February 12, 2005,

---

[8]  In fact, as noted above, Mr. Journee was 41 in 2005.

18

just days prior to the filing of the EEOC Charge, and CMHA did not make the hiring decision with respect to that position until after the February 15 Charge date.  While Maxwell did apply for additional positions, moreover, several of those applications were made after the May 12, 2005 date on which Maxwell received his right to sue letter.  Issues relating to those job openings simply *could not* have been incorporated into his February, 2005 Charge, and would not have reasonably grown out of an EEOC investigation into it.

Despite this sequence of events, Maxwell did not file a new EEOC/OCRC Charge upon which he could have predicated a federal law discrimination claim relating to CMHA's rehiring decisions.  Accordingly, to the extent Maxwell now wants to assert an age discrimination claim for failure to rehire, this Court does not have jurisdiction over the claim because Maxwell has neither asserted such a claim in his Amended Complaint, nor exhausted his administrative remedies with respect thereto.  29 U.S.C. § 626(d)(2).[9]

### C.    Analysis

Sixth Circuit law provides the standards and applicable analysis for both the federal age discrimination claim and the state retaliation claim.  *See Chandler v. Empire Chem., Inc. v. Midwest Rubber Custom Mixing Div.*, 99 Ohio App. 3d 396, 402 (Ohio Ct. App. 2004) (stating that "federal law provides the applicable analysis for reviewing retaliation claims" arising under Ohio law).  The issue before the Court is whether material issues of fact exist with respect to any element of each claim, respectively.

_____

[9] It is conceivable that Maxwell could have asserted a failure to rehire claim under state law *only*.  In other words, Maxwell may have been able to assert a failure to rehire claim without first exhausting any administrative remedies relating thereto and invoked the Court's supplemental jurisdiction as he did with respect to his retaliation claim.  Whether he could have taken that approach (which is unclear), the fact remains that he did not seek to do so, despite opportunities to amend and refine his Complaint throughout this litigation.

### 1.      Age Discrimination

The Age Discrimination in Employment Act ("ADEA") states:

It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .

29 U.S.C. § 623(a)(1).

Maxwell's Amended Complaint alleges that CMHA failed to offer him a transfer within the agency on the basis of age discrimination – a discharge claim under the ADEA.

### i.      Age Discrimination:  Failure to Transfer

Employers do not have a duty to transfer employees to other open positions within the company when their positions have been eliminated during a RIF.  *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 623 (6th Cir. 2006); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 374 (6th Cir. 1999).  When an employer transfers some employees whose positions have been eliminated and not others on the basis of age discrimination, however, the employer violates the ADEA.  *Id*.

Under the ADEA, the plaintiff may establish his claim by presenting direct evidence of age discrimination.  Because direct evidence of age discrimination is rare, the plaintiff may also establish his claim by presenting circumstantial evidence from which a jury could infer age discrimination.  When the plaintiff uses the latter approach, the Court applies the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  *See EEOC v. DHL Express (USA), Inc.*, No. 1:06CV2371, 2007 WL 4125922, *4 (N.D. Ohio Nov. 19 2007).  Here, Maxwell has not presented direct evidence of age discrimination and

20

argues under the *McDonnell Douglas* framework.  *See* Doc. 54-3 at 9.  In addition, Maxwell

concedes that his case is governed by the line of Sixth Circuit authority applicable to situations in

which the employee is terminated in connection with a RIF.  *See id.* (citing *Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (citing *Barnes v. GenCorp, Inc.*,

896 F.2d 1457, 1465 (6th Cir. 1990)).[10]

Accordingly, the Court will apply the *McDonnell Douglas* framework, as refined with

respect to RIF circumstances in *Barnes*, which first requires a plaintiff to establish a *prima facie*

case.  *McDonnell Douglas Corp.*, 411 U.S. at 802; *Barnes.*, 896 F.2d at 1465.  To make out a

*prima facie* case of age discrimination based on failure to transfer, Maxwell must produce

evidence that: (1) he is a member of a protected group – *i.e.*, he was at least 40 years old at the

time of the RIF; (2) he was qualified for other available positions at the time of the RIF; (3) he

was not offered the position; and (4) "a similarly-situated employee who is not a member of the

protected class was offered the opportunity to transfer to an available position, or other direct, in-

direct, or circumstantial evidence supporting an inference of discrimination."  *Ercegovich*, 154

F.3d at 351.

---

[10] While he does not do so either in his EEOC Charge, in his Amended Complaint, or in his briefing, in his deposition, Maxwell implies that the RIF itself may have been illegitimate – *i.e.*, an excuse to engage in broad-scale age discrimination.  Maxwell offers nothing other than his own generalized suspicions to support this belief, however.  Thus, when asked why he thought he and many of the other employees terminated in connection with the RIF were victims of age discrimination, Maxwell admitted that no one at CMHA had ever mentioned discharging older employees or that doing so would save money.  Maxwell Dep. 61.  And, when asked why he believed employees outside the TAG group were discriminated against on the basis of age, he said that he believed that a very high percentage of them were older and had accumulated a lot of sick leave, vacation time, and benefits, though he offered no proof to support this belief.  Curiously, he also asserted that CMHA's stated reason for the RIF – a decrease in funding – could not be legitimate "because the savings for 32 people out of a staff of over 1,000 would be minimal."  *Id*.  Again, he offers no monetary basis for this assumption, however, and given the scope of the RIF, it does not seem logical.

Ultimately, despite these generalized attacks on the legitimacy of the RIF, Maxwell does little to support questioning it and concedes that the legal analysis this Court should employ should be that which considers transfer and termination decisions made in the course of and in connection with an otherwise legitimate RIF.

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *Ercegovich*, 154 F.3d at 350. The ultimate burden of persuasion always remains with the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

Maxwell's failure to transfer claim survives the first step of the *McDonnell Douglas* framework, but ultimately fails because he cannot meet his burden of persuasion with respect to pretext.

### a.    *Prima Facie* Case

Maxwell easily satisfies the first and third elements of his *prima facie* case. He was 54 years old at the time of the RIF in February, 2005, when CMHA terminated his employment. CMHA did not offer Maxwell the opportunity to transfer to another position at CMHA.

Next, Maxwell must present sufficient evidence that a similarly situated CMHA employee who was substantially younger was offered the opportunity to transfer. Specifically, Maxwell must establish that CMHA offered the opportunity to transfer to a substantially younger TAG employee whose position was eliminated in the RIF. The parties agree that TAG employees are the relevant comparable group because, although the law does not require an exact correlation for employees to be "similarly situated," the employees must be similar in all relevant respects. *See Ercegovich*, 154 F.3d at 352. Because all of the TAG employees had the same supervisor and essentially the same job description, they define the universe of similarly situated employees. Tracy Reese, age 37, was transferred from TAG to a Program Analyst position around the time of the RIF. As discussed above, although the timing of Ms. Reese's transfer raises the issue of whether she was actually a

22

member of TAG on February 4, 2005, for purposes of summary judgment, the Court assumes that she was a member of TAG. Therefore, Maxwell has satisfied the requirement that a similarly situated, substantially younger employee was offered the opportunity to transfer.

Lastly, Maxwell must show that he was qualified for the position. Given that (1) Reese transferred to a position within the same department as TAG; (2) TAG employees often substituted in positions within the Planning and Analysis department; and (3) Maxwell had extensive experience at CMHA as a project manager, the Court finds that he was qualified for the position.

Therefore, Maxwell has satisfied the elements of his *prima facie* failure to transfer claim.[11] *See Ercegovich*, 154 F.3d at 353.

### d. Pretext

Once the plaintiff establishes a *prima facie* case for an age discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *Barnes*, 896 F.2d at 1464. In this case, CMHA offered the following reasons for deciding not to retain Maxwell. First, CMHA notes that Maxwell had a criminal record. Second, CMHA points to his disciplinary record, including incidents of three conflicts with other CMHA employees, one of whom was his direct supervisor. CMHA also argues that the TAG employees who were offered transfers were qualified for their new positions. The Court finds that these are legitimate, non-discriminatory reasons for CMHA's decision not to retain Maxwell.

---

[11] Maxwell also argues that Brian Journee's transfer supports his claim as well, despite the fact that Journee was 41 at the time of the RIF. The Court acknowledges that Maxwell's argument on this point is well-taken, *see O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (holding that replacement by "substantially younger" employee satisfies *prima facie* case), but need not address it because the Reese transfer provides a sufficient basis for Maxwell's *prima facie* case, and the reasons CMHA gives for its decision not to retain Maxwell are not tied to Reese or Journee specifically.

The proffer of these legitimate, non-discriminatory reasons shifts the burden to Maxwell to establish that they are mere pretext for discriminatory motives. Maxwell can meet his burden if he can show that the reasons: (1) have no basis in fact; (2) did not actually motivate the challenged conduct; or (3) are insufficient to explain the challenged conduct. *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). "At this final stage, [t]he burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff." *Bender*, 455 F.3d at 624 (omitting quotations). In other words, it is Maxwell's duty to present evidence that CMHA's asserted reasons are actually a pretext for age discrimination. *See St. Mary's Honor Center*, 509 U.S. at 508-09. Essentially, CMHA asserts that its decision not to retain Maxwell was a business decision. In order to establish pretext, Maxwell must demonstrate that CMHA's business decision "was so lacking in merit as to call into question its genuineness." *Bender*, 455 F.3d at 625. The fact that CMHA's decision was not wise or miscalculated the relative qualifications of available candidates is relevant to the question of pretext, but is not dispositive. *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 577 (6th Cir. 2003).

Maxwell argues that the asserted justifications are pretextual because his extensive experience at CMHA made him the most qualified candidate for transfer within the Planning and Analysis department. Furthermore, he argues that the fact that, of the six TAG employees, CMHA either transferred or attempted to rehire all three of the employees who were 41 or younger is circumstantial evidence of age discrimination. He also vehemently contends that any assertion that CMHA chose not to retain him based on his criminal and disciplinary record has no basis in fact, was not the actual reason CMHA did not transfer him, and/or is not a sufficient reason in light of his long employment at CMHA and extensive work experience. He points out that CMHA, an agency with

24

a history of giving ex-convicts a second chance, hired him and employed him for more than a decade knowing that he had a criminal record.  Likewise, he argues that the notion that CMHA did not transfer him because of his disciplinary record is dubious because he received consistently high performance reviews.

First, qualifications evidence is not sufficient to establish pretext in and of itself, and is only substantially probative of pretext in conjunction with other evidence of pretext.  The Sixth Circuit recently discussed qualifications evidence in the context of establishing pretext in *Bender*, 455 F.3d at 625-28.

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. *See, e.g., Jenkins*, 106 Fed. Appx. at 995 (reversing lower court's grant of summary judgment; in addition to evidence of superior qualifications, the plaintiff provided evidence of "irregularities in the application and selection process," "inconsistencies in the reasons given ... for not hiring her," and "the lack of African-American women in supervisory positions" at the company). On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Id.* at 626-27.  Therefore, unless Maxwell's other arguments with respect to pretext are viable, the fact that he was very qualified for a transfer is not sufficient to establish pretext.

Maxwell's argument that the employees in the protected class were terminated, while younger employees were retained is a very general circumstantial or statistical argument.  It fails as

25

a statistical argument because Maxwell is not a statistical expert and does not address the other reasonable explanations for his general observations. *See Barnes*, 896 F.2d at 1466 (stating that "statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity"). Without the assistance of an expert, the Court is not persuaded that the circumstances of this case – six employees between the ages of 37 and 70 – show a statistically significant disparity in the treatment of protected and non-protected employees. Even if there is a disparity, Maxwell has not eliminated apparent explanations such as the fact that the few employees CMHA chose to retain were very highly regarded and that Maxwell's run-ins with CMHA authorities were enough to cause CMHA to bypass him for the positions in light of the alternatives.

Maxwell's argument that his criminal record is irrelevant has some merit. Maxwell has proffered evidence which supports his contention that his criminal record was not the basis of CMHA's decision not to retain him. As Maxwell notes, CMHA knew of his criminal conviction for check fraud when it hired him and took no disciplinary action against him at the time he plead guilty to domestic violence. His other run-ins with law enforcement, moreover, never resulted in convictions and, thus, amount to no more than accusations. These facts support Maxwell's claim that his criminal record was not the actual reason for CMHA's decision not to transfer him after the RIF and, thus constitute evidence of pretext.

Taken as a whole, however, Maxwell's disciplinary record is sufficient to support CMHA's decision not to transfer him. Whether or not Maxwell was capable of performing the technical aspects of his job, Maxwell obviously had a problem dealing with co-workers, both subordinates and supervisors alike. While his outbursts and improper interactions with co-workers may not have led to his discharge at the time, they are legitimate factors for CMHA to weigh when choosing a finite

26

number of employees to keep in the wake of a necessitated RIF.  While Maxwell asserts that he was "exonerated" with respect to the steering incident, moreover, he presents no evidence of that fact (by way of investigative determination or otherwise), and CMHA apparently believes the matter was never fully resolved.  Even without that incident, Maxwell's disciplinary record, and what it indicates about Maxwell as an employee, are part and parcel of his qualifications.  Therefore, although there is *some* evidence of pretext in addition to the fact that Maxwell was qualified by experience and training, it is not sufficient to overcome CMHA's business justification argument under the sliding-scale approach articulated by the Sixth Circuit in *Bender*, *supra*.

Maxwell bears the ultimate burden of persuasion; he must raise a material issue of fact indicating that CMHA discriminated against him on the basis of age.  *See St. Mary's Honor Center*, 509 U.S. at 508-09 (noting in connection with pretext in a race discrimination case that proving the existence of a "crusade" to terminate the plaintiff does not establish pretext, instead, the plaintiff must prove that the crusade was motivated by race discrimination); *Bender*, 455 F.3d at 624. Maxwell does not deny that he had a history of run-ins with other CMHA employees, he simply asserts either that he was in the right in those incidents or that they were not so egregious as to justify the conclusion that he was a difficult employee.  The fact that he may disagree with CMHA's assessment of his disciplinary record, and of how that record reflects on his fitness for continued employment, however, does not change the fact that CMHA's decision was a legitimate business choice at the time.  Ultimately, the Court concludes that Maxwell has not shouldered his burden of producing sufficient evidence of pretext to withstand summary judgment on his ADEA claim.

Accordingly, CMHA's motion for summary judgment is **<u>GRANTED</u>** with respect to Maxwell's failure to transfer claim under the ADEA.  That claim is therefore dismissed.

## 2.       Retaliation Claim

Maxwell alleges that CMHA retaliated against him for filing this lawsuit by directly influencing HUD to decertify him as a REAC inspector.  Maxwell asserts his retaliation claim under Ohio law, O.R.C. §§ 4112.02(I) and 4112.99.[12]

The *McDonnell Douglas* burden-shifting approach applicable to Maxwell's age discrimination claims also applies to Plaintiff's state law retaliation claim. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *Chandler*, 99 Ohio App. 3d at 402.  In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his exercise of such protected activity was known by the defendant; (3) the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action").  As with an age discrimination claim, once the plaintiff establishes a *prima*

---

[12]  In light of the Court's dismissal of Maxwell's federal age discrimination claims, the Court could decline to exercise supplemental jurisdiction over the remaining state law retaliation claim.  28 U.S.C. § 1367(c)(3); *Blakely v. U.S.*, 276 F.3d 856, 863 (6th Cir. 2002).  The Court may retain jurisdiction under these circumstances in the interest of judicial efficiency, fairness, comity, or underlying issues of federal policy, however.  *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Blakely*, 276 F3d at 863.  In fact, retaining jurisdiction at least through this dispositive motion stage seems to serve all of these interests.  The Court is familiar with the facts and issues in this case because it has been pending before the Court since 2005.  Fairness suggests that the parties should legitimately expect that all dispositive motions put before the Court be resolved and that they not be forced to re-brief these issues before a new judicial officer.  In addition, Magistrate Judge Baughman has already conducted a mediation with the parties and a second mediation before Magistrate Judge Baughman is contemplated once these motions are resolved.  Overall, judicial efficiency favors retaining jurisdiction at least for the time being.  Accordingly, the Court will exercise its discretion to retain jurisdiction of Maxwell's retaliation claim in order to resolve this motion for summary judgment and to give the parties a second opportunity to resolve this case through mediation with Magistrate Judge Baughman.  If mediation is not successful, the Court then will give the parties an opportunity to brief the issue of retaining supplemental jurisdiction and may find that, because the Plaintiff initially chose to litigate his claims in state court, remand is appropriate.

*facie* case for either a discrimination or retaliation claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Abbott*, 348 F.3d at 542. The plaintiff must then demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *Id.*

### a.  Protected Activity Known to CMHA

Maxwell easily satisfies the first two elements of his *prima facie* case: filing this lawsuit was a protected activity, and CMHA was well aware of its existence.

### b.  Materially Adverse Action

Whether CMHA's conduct constituted a materially adverse action deserves closer scrutiny. Specifically, the issue is whether CMHA engaged in a materially adverse action when it notified HUD of its belief that Maxwell conducting REAC inspections at HUD properties was a potential conflict of interest. CMHA argues that this was not a materially adverse action because CMHA did not, and could not, decertify Maxwell as a REAC instructor. It notes that only HUD had the authority to decertify Maxwell, and that HUD did so based on deficiencies in Maxwell's inspections at non-CMHA properties.

The Court rejects CMHA's argument, particularly in light of the Supreme Court's decision in *Burlington N.*, which clarified that the purpose of a retaliation lawsuit is to prevent employers from taking action that might "dissuad[e] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 126 S. Ct. at 2415 (omitting quotations). A "material adverse action" must be more than a minor slight or interference, but does not need to be work-place or employment related. *Id*. Furthermore, because these claims frequently arise after termination, common sense dictates that a former employee be allowed to bring a retaliation claim. *See Robinson*

29

*v. Shell Oil Co.*, 519 U.S. 337, 340, 346 (1997) (allowing retaliation claim to proceed when former employer gave plaintiff a negative reference to a potential employer and holding that former employees may challenge retaliatory actions); *James v. Metropolitan Government of Nashville*, 243 Fed. Appx. 74, 79 (6th Cir. 2007) (citing *Robinson*).

The possibility that Maxwell would lose his certification as a HUD REAC inspector was more than a trivial interference with his right to employment, and certainly sufficient to cause a reasonable worker in Maxwell's position to consider abandoning this lawsuit in the hopes that doing so would cause CMHA to withdraw its objection and allow him to conduct the inspections.  Indeed, even if Maxwell and CMHA did not anticipate that he would be decertified, the lost revenue as a result of being barred from performing the contract he signed with REAC to inspect CMHA's properties would be a substantial interference with Maxwell's livelihood.  Therefore, CMHA's objection to Maxwell performing the REAC inspections is a materially adverse action, and the third element of his *prima facie* claim is satisfied.

### c.    Causal Connection

Next, CMHA argues that there is insufficient evidence of a causal connection between Maxwell's protective activity – this lawsuit – and the materially adverse actions – CMHA's objections to his REAC inspections.  "To establish a causal connection, a plaintiff must 'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Dixon*, 481 F.3d at 333 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997)).  "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."  *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 737 (6th

Cir.2006); *see also Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007).

Here, Maxwell filed a grievance pursuant to CMHA's policy after he was terminated, filed with the OCRC and EEOC in February, 2005, and received a "right to sue" letter from the EEOC in early May, 2005.  Maxwell filed this lawsuit, in the Cuyahoga County Court of Common Pleas, on August 4, 2005.  CMHA initially notified HUD of a potential conflict of interest in March of 2006 – approximately seven months *after* this lawsuit was filed.  Furthermore, CMHA renewed its objection in November 2006, after Maxwell obtained the contract to do the 2007 REAC inspections at CMHA properties.  The fact that this lawsuit preceded CMHA's objection by less than a year is some indication of a retaliatory motive.  *See Singfield*, 389 F.3d at 563.

The contradictions in executive director Phillips' deposition testimony, the letter from the Inspector Administrator of REAC to Phillips noting CMHA's complaints about Maxwell, the fact that CMHA did not initially inform HUD or REAC about this lawsuit, and the emails exchanged between CMHA, HUD and REAC regarding Maxwell also provide circumstantial evidence of a retaliatory motive.  This evidence, in conjunction with the temporal proximity of this lawsuit and CMHA's objections, establishes a causal connection for purposes of Maxwell's *prima facie* retaliation case.

### b.    Pretext

As in the age discrimination context, once the plaintiff establishes his *prima facie* case, the burden shifts to the employer to articulate a legitimate non-retaliatory explanation for the action.  CMHA's explanation is clear and reasonable:  it believed that a conflict of interest existed based on Maxwell's status as a former employee who had been terminated and because he had filed this

31

lawsuit against CMHA.  Although Maxwell argues that CMHA had no basis to believe that a conflict of interest existed, this argument is undermined by the fact that REAC initially agreed with CMHA's interpretation of the contract provision regarding conflicts of interest, and asked Maxwell to sub-contract the CMHA inspections.  In addition, CMHA makes a compelling argument that, in raising conflict of interest, it was simply exercising its own right to protect the agency's interest in fair inspections.  Likewise, in renewing its objections after Maxwell's 2006 inspections resulted in lower scores, CMHA was notifying HUD and REAC of some circumstantial evidence of retaliation on *Maxwell's* part; *i.e.*, the manifestation of a conflict of interest.

 CMHA has provided a legitimate, non-retaliatory reason for notifying HUD of a potential conflict of interest.  Therefore, Maxwell must establish that CMHA's reasons are actually a pretext for a retaliatory motive.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *See Singfield*, 389 F.3d at 564 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Although CMHA's explanation makes facial sense, several facts undermine it:  (1) questions regarding executive director Phillips' role in asserting the objection are apparent from comparing the testimony and exhibits at the depositions conducted in this case; (2) the relationship between CMHA and the Inspector Administrator of REAC suggests that CMHA objected more strongly than they have represented in this lawsuit – for example, based on the letter from the Inspector Administrator of REAC to the executive director of CMHA, *see* footnote 7, a jury might reasonably conclude that CMHA was directly involved in decertifying Maxwell; and (3) clearly, it was not necessary to decertify Maxwell in order to address CMHA's conflict of interest concerns – therefore,

32

why did the Inspector General get involved?  With respect to CMHA's actual motivation, the Inspector General's relationship with CMHA also suggests that the narrow purpose of addressing the conflict of interest may not have actually been the sole and entire motivation for CMHA's objections. Under these circumstances, there are material issues of fact appropriate for a jury, and an inference of retaliation would not be unreasonable.

Accordingly, Maxwell has satisfied the *McDonnell Douglas* test and his retaliation claim survives summary judgment.  *See Singfield*, 389 F.3d at 564-65 (denying summary judgment on retaliation claim and advising caution in granting summary judgment on such claims).  CMHA's motion for summary judgment is **DENIED** with respect to Maxwell's retaliation claim.

IV.     **CONCLUSION**

Defendant Cuyahoga Metropolitan Housing Authority's *Motion for Summary Judgment* (Doc. #52) is **GRANTED in part and DENIED in part**.  Summary judgment is **GRANTED** with respect to Plaintiff Kenneth Maxwell's age discrimination claims and **DENIED** with respect to his retaliation claim.


**IT IS SO ORDERED.**


                                        s/Kathleen M. O'Malley
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**
**Dated: March 18, 2008**

33